UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSHUA WALKING EAGLE,<br><br>Defendant. | 3:20-CR-30117-RAL-1<br><br>REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS |

In this second-degree murder, assault, and firearm case, Joshua Walking Eagle moves to suppress all statements he made and any physical evidence acquired during the initial stages of a homicide investigation. While most of Walking Eagle's statements were legitimately obtained, three of a tribal agent's inquiries – and the responses to them – ran afoul of *Miranda*[1] and require suppression as substantive, but not impeachment, evidence. And because there was no improper search or seizure conducted during the investigation, no Fourth Amendment issue arises that could otherwise call for the exclusion of evidence.

## BACKGROUND

Just after 3:00 p.m. on May 29, 2020, Rosebud Sioux Tribe Law Enforcement Services (RSTLES) received reports that a black SUV with a passenger hanging out of

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

the window was stopped on the road near the All Stop convenience store in Rosebud, South Dakota. RSTLES and Rosebud Sioux Tribe Emergency Medical Services (RSTEMS) responded and observed a middle-aged male with massive head trauma from a gunshot wound on the ground next to the SUV. The male, later identified as Lloyd Walking Eagle (Lloyd), was deceased. Witnesses stated that when the SUV stopped, the driver, Roger Good Shield, Jr. (Good Shield), got out of the vehicle and walked away.

RSTLES then received a call for service reporting that Good Shield was injured at a residence in the Fairgrounds Housing Community. Officers arrived, located Good Shield, observed that he was bleeding from the head, and had an ambulance transport him to the Rosebud IHS hospital. After Good Shield was treated and released, RSTLES arrested him.

In the meantime, RSTLES Special Agent Mark Kettell talked to witnesses who previously observed the SUV in front of Tanya Walking Eagle's (Tanya) residence, in the same Community as officers found Good Shield. Witnesses reported that, after what sounded like gunshots, several men scattered from Tanya's driveway, the SUV sped away, and a male with long hair and tattoos ran into the residence. Officers met with Tanya and asked if they could look inside the house for the male witnesses described. Tanya consented and unlocked the door to allow officers entry.

At around 5:00 p.m., Kettell and three other officers announced themselves as they entered the home and located Walking Eagle sleeping in a bedroom. With

sidearms drawn, they roused Walking Eagle and asked whether he had any weapons. Walking Eagle said "no," and requested assistance. Kettell helped Walking Eagle up and informed him that he was not under arrest, but that officers would be putting handcuffs on him until they knew what was going on.

Kettell stated that they were conducting an investigation and wanted to know whether Walking Eagle lived in the house. RSTLES Officer Joshua Antman advised Kettell that Walking Eagle was visiting from Rapid City. When asked whether anyone else was in the residence, Walking Eagle stated that he could not answer the question because he had been asleep, but "pretty much no," there was no one else. After officers led Walking Eagle outside, Antman conducted a sweep of the interior for other occupants, found none, and exited the home to watch Walking Eagle.

Once seated on the front porch of the residence, Walking Eagle asked, "What happened?" Antman responded, "That's what we're here to find out." Walking Eagle remarked that he had been laying down inside after drinking and working on a vehicle. After a pause, Walking Eagle asked if he could smoke a cigarette before officers took him away. Antman clarified that Walking Eagle was not under arrest, but because of the nature of the incident and Walking Eagle's oppositional behavior in the past, he would remain handcuffed. Walking Eagle nodded and acknowledged his history of resisting officers.

For their records, officers began to take pictures of Walking Eagle's bruises, injuries he said happened earlier. Then, hearing the wails of a distraught family

member coming from the street, Walking Eagle repeatedly asked what happened and noted that it was his "Auntie" yelling. Antman replied that officers were trying to figure out what was going on. As Walking Eagle continued his attempts to find out "what happened," Kettell returned to the porch and asserted that people witnessed Walking Eagle standing outside before running into Tanya's house. Again, Walking Eagle asked, "What happened?" Kettell told Walking Eagle that while he was not under arrest, officers wanted to talk with him at the station about the incident.

Once more, Walking Eagle asked, "What happened?" Kettell answered, yet again, that was what officers were trying to find out. Ever persistent, Walking Eagle asked, "What the f*** happened?" Kettell retorted that witnesses saw Walking Eagle had been at "the vehicle" and declared that he needed to know what Walking Eagle knew. When Walking Eagle began to explain that he had been working on the window of the car out front, officers informed him they were talking about a different vehicle. Walking Eagle continued and remarked that he did not have a "ride" and had been intoxicated so he went in the home to sleep.

Kettell advised Walking Eagle that officers needed to know "what happened out here with the black SUV." Walking Eagle asked, "Who?" In response, Kettell reiterated that people saw him outside and that he was "conducting a homicide investigation." Walking Eagle riposted, "What the f***?" and "Who?" At this point, Lloyd's family began to walk up the driveway toward the house.

The group wept as they approached Walking Eagle, yelled at him, hugged him, and informed him that Lloyd, Walking Eagle's uncle, was gone. As the grieving clan made their way into the house, they briefly conversed with Walking Eagle about Lloyd's death. Reacting to their comments, Walking Eagle told the kinfolk that Lloyd had just been there with him and started crying.

Once the group were all in the home, Kettell requested Walking Eagle to take a PBT. Walking Eagle acquiesced and blew a 0.096. Afterward, Walking Eagle began to describe his life situation. Kettell redirected Walking Eagle saying, "I just, I just need you to tell us the truth though, that's what we got to get down to, okay?" In rejoinder, Walking Eagle moaned and asked, "Who the f*** did this, man?" Again, Kettell explained that officers were trying to figure that out.

After one family member came and hugged Walking Eagle, Kettell informed Walking Eagle that officers were going to remove the handcuffs, but that they needed to talk with him when he was sober. Once uncuffed, Walking Eagle grieved on the porch while relatives sat with him there. As officers walked away from him toward the street, Walking Eagle exclaimed, "Who the f*** did this man? F*** he was just out here, we was all ready to come out. Alls we had to do was just go to Grass Mountain and get the window and put it in there. He was just here! When I went to sleep, he was just here."

The next day, May 30, 2020, Kettell and FBI Special Agent Kent Brown interviewed Good Shield at the Rosebud Sioux Tribe Adult Correctional Facility. During the interview, Good Shield said that he drove to Walking Eagle's home,

5

stopped, and asked Victor Clairmont (Clairmont) why the people in the driveway were "dogging" him. When Clairmont and Walking Eagle backed away from the driver's door, Lloyd opened the front passenger side door and reached in, purportedly to put the vehicle in park. As Lloyd did this, Good Shield felt a "flash" from the driver side and noticed blood on his eye.

After the shot, Good Shield sped away from the scene but stopped about a quarter mile away at the All Stop because his eye was bleeding and he could not see anymore. He then removed the keys and walked, along the road, toward his house. Good Shield reported that he saw Walking Eagle with a shotgun earlier but maintained that he did not see any guns during the incident and did not know who shot Lloyd. An autopsy report conducted on June 1, 2020, showed that the cause of Lloyd's death was a shotgun wound to his head.

Roughly three months later, a federal grand jury indicted Walking Eagle on second degree murder and firearm use charges.[2] Walking Eagle then moved to suppress all statements and physical evidence obtained during his interaction with officers at Tanya's residence.[3] The government responded, opposing the motion.[4] Following the

---

[2] Docket No. 1 (citing 18 U.S.C. §§ 1153, 1111, and 924(c)(1)(A)).

[3] Docket Nos. 48, 49 (motion and supporting memorandum).

[4] Docket No. 50 (response).

evidentiary hearing held on Walking Eagle's motion, the grand jury superseded the indictment, adding six new assault and firearm charges.[5]

## DISCUSSION

**A. Miranda**

Walking Eagle first claims that while in custody, officers interrogated him without warnings in violation of *Miranda.* He says his statements, made during the interrogation, should be excluded.[6] The Court agrees, but only in part.

Reinforcing the Fifth Amendment, the *Miranda* decision requires law enforcement officers to warn suspects of their rights before engaging in custodial interrogation.[7] Interrogation is any question, word, or action that an officer should know is "reasonably likely to elicit an incriminating response."[8] Custody,[9] for purposes of *Miranda*, exists when: (1) a suspect is formally arrested, or (2) the suspect's "freedom

---

[5] Docket No. 67 (adding charges under 18 U.S.C. §§ 113(a)(1), 113(a)(3), 113(a)(6), 924(c)(10(A).

[6] Docket No. 49 at 4-5.

[7] *See Miranda*, 384 U.S. at 444 (failing to provide timely warning may lead to the prosecution's inability to use statements stemming from the interrogation).

[8] *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

[9] *See Howes v. Fields*, 565 U.S. 499, 508-09 (2012) ("As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion.").

of movement" is restricted to a "degree associated with a formal arrest."[10] In determining the extent to which a suspect's freedom of movement was restricted, a court must delve into the circumstances surrounding the interrogation and decide whether a reasonable person would "have felt he [ ] was at liberty to terminate the interrogation and leave."[11]

Relevant factors in the custody determination include, "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of [the suspect] at the end of the questioning."[12] The Eighth Circuit has set forth common "indicia" which tend to either mitigate or aggravate an atmosphere of custodial interrogation.[13] These indicia, while instructive, are not dispositive or exhaustive.[14] They are merely one way to ascertain whether the suspect's movement was curtailed, as though he was under

---

[10] *California v. Beheler*, 463 U.S. 1121, 1125 (1983).

[11] *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011).

[12] *Howes*, 565 U.S. at 509.

[13] *See United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).

[14] *See id.*; *see also United States v. Thomas*, 664 F.3d 217, 222 (8th Cir. 2011); *United States v. Brave Heart*, 397 F.3d 1035, 1039 (8th Cir. 2005); *United States v. Czichary*, 378 F.3d 822, 827 (8th Cir. 2004).

formal arrest, and subjected to the same inherently coercive pressures as the station house questioning at issue in *Miranda*.[15]

**1. Within the Home**

In *Orozco v. Texas*, the Supreme Court addressed custodial interrogation under strikingly similar circumstances and found a *Miranda* violation.[16] There, several hours after a murder, a woman admitted four officers into the defendant's bedroom at a boardinghouse.[17] Officers woke the defendant and proceeded to vigorously question him about his whereabouts that night and a pistol, with one officer later testifying that the defendant had not been free to leave.[18] In that context, despite being questioned in the familiar setting of his own room, the Court held that *Miranda* applied and that officers had violated it when they failed to give the required warnings before interrogating the defendant.[19]

Here, a couple of hours after a gun-related homicide, four officers entered a home with the owner's consent.[20] Inside, officers drew their weapons and roused

---

[15] *See Howes*, 565 U.S. at 509.

[16] *Orozco v. Texas*, 394 U.S. 324, 327 (1969).

[17] *Id.* at 325.

[18] *Id.* at 325-26.

[19] *Id.* at 326-27.

[20] *See* Mot. Hr'g Ex. 2 at 7 (Dec. 28, 2021) ("Tonya [sic] unlocked the door and let myself, Officer Roe, Officer Dillon and Officer Antman in the residence").

Walking Eagle, told him to show his hands, informed him that he was not under arrest, and handcuffed him.[21] Kettell testified that, while shackled, Walking Eagle was not free to leave.[22] As in *Orozco*, Walking Eagle was not free to leave when officers questioned him.[23] Given these circumstances, the Court finds that Walking Eagle was in custody from the moment officers woke him up.

Unlike *Orozco* though, the questioning of Walking Eagle that followed did not venture into the realm of suppressible interrogation.[24] Under the public safety exception to *Miranda*, a suspect's answers to questions from police officers are admissible without any *Miranda* warning so long as the questions are "reasonably prompted by a concern for public safety" and are not merely designed to "solicit testimonial evidence."[25] In the home, Kettell asked only general questions: whether Walking Eagle had any weapons,

---

[21] *See* Mot. Hr'g Ex. 13 at 07:05-07:40.

[22] *See* Mot. Hr'g Tr. 35 (Dec. 28, 2021) ("Q. And he was not free to leave? A. Not while he was handcuffed, no.").

[23] *See Orozco*, 394 U.S. at 326 ("the *[Miranda]* opinion iterated and reiterated the absolute necessity for officers interrogating people 'in custody' to give the described warnings").

[24] *See New York v. Quarles*, 467 U.S. 649, 659 n.8 (1984) (distinguishing *Quarles* from *Orozco* by noting that the questioning in *Orozco* was clearly investigatory and "did not in any way relate to an objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon").

[25] *United States v. Everman*, 528 F.3d 570, 572 (8th Cir. 2008).

10

if he lived there, and if anyone else was within.[26] And because officers were investigating a shooting in an unknown environment and had not yet completed a protective sweep of the residence, such inquiries were reasonably necessary to ensure their safety.[27] Thus, irrespective of whether Kettle's questions could be construed as interrogatory, Walking Eagle's answers may be admitted into evidence under the public safety exception.[28]

**2. On the Porch - Handcuffed**

At some point, officers removed Walking Eagle, still handcuffed, from the home and seated him on the front porch.[29] Antman stood a few feet away and made small talk

---

[26] *See* Mot. Hr'g Ex. 13 at 07:15-08:35.

[27] *See Everman*, 528 F.3d at 572 ("The public to be protected can include the officers themselves."); s*ee also Lamb v. State*, 127 Nev. 26, 34, 251 P.3d 700, 705 (2011) ("*Quarles* covers officer safety, as well as public safety," and "encompasses questions necessary to secure the safety of police officers").

[28] *See United States v. Noonan*, 745 F.3d 934, 937 (8th Cir. 2014) ("the risk of police officers being injured by the mishandling of unknown firearms or drug paraphernalia provides a sufficient public safety basis to ask a suspect who has been arrested and secured whether there are weapons or contraband in a car or apartment that the police are about to search"); *United States v. Williams*, 181 F. 3d 945, 953-54 (8th Cir. 1999) (although suspect's hands were cuffed, officers "could not have known if any armed individuals were present in the apartment or preparing to enter [it;]" nor could they have "known whether [ ] hazardous weapons were present [ ] that could cause them harm if they happened upon them unexpectedly or mishandled them in some way").

[29] *See* Mot. Hr'g Ex. 14 at 00:15.

with Walking Eagle until the other officers returned.[30] Kettell and Antman both testified that Walking Eagle was not free to leave at this point and that if he had tried to, he would have been apprehended.[31] While handcuffed on the porch, Walking Eagle was not at liberty to end the encounter and remained in custody.

Even so, did officers say or ask anything that was "reasonably likely to elicit an incriminating response?"[32] For the most part, the utterances officers made on the porch were appropriate follow up to volunteered statements and questions from Walking Eagle.[33] But three of Kettell's remarks are problematic.

The first involves the following exchange:

Walking Eagle: What the f*** happened?

Kettell: But, you know the people tell me that you were at the vehicle. Middle of the day, people saw you. Okay? So I need to know what you know. You understand?[34]

---

[30] *See* Mot. Hr'g Tr. 47 ("Due to the nature of the incident, it was my instincts … just to kind of keep small talk … to gauge Josh.").

[31] *See* Mot. Hr'g Tr. 35 ("Q. And he was not free to leave? A. Not while he was handcuffed, no."); 52 ("Q. [] If he had fled, would you have chased him? A. Yes.").

[32] *Innis*, 446 U.S. at 301.

[33] *See Miranda*, 384 U.S. at 478 ("volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by the [*Miranda* holding]"); *United States v. Jackson*, 852 F.3d 764, 771-774 (8th Cir. 2017) (no interrogation because of limited follow-up to volunteered statements).

[34] *See* Mot. Hr'g Ex. 14 at 04:53-05:02.

The initial portion of the statement where Kettell described the facts of the situation is a proper response to Walking Eagle's volunteered question.[35] Kettell, however, went further stating, "I need to know what you know." By doing so, Kettell went outside the scope of Walking Eagle's question and inquired into an area that was reasonably likely to generate an incriminating response from a suspect in custody.[36]

The other two concerning moments arise from Kettell's statements, "Yeah, but we need to know what happened out here with the black SUV,"[37] and "I just, I just need you to tell us the truth though, that's what we got to get down to, okay."[38] Given the situational context and his knowledge that a man fitting Walking Eagle's description had recently fled into Tanya's home from the scene of a shooting homicide, Kettell's requests for information directly related to the substantive offense and were reasonably

---

[35] *See United States v. Wipf*, 397 F.3d 677, 687 (8th Cir. 2005) ("'law enforcement officer's mere description of the evidence and of potential charges against a suspect, in direct response to the suspect's importuning, hardly can be classified as interrogatory.'" (quoting *United States v. Conley*, 156 F.3d 78, 83 (1st Cir. 1998))); *United States v. Waters*, 5:18-CR-50015-JLV, 2019 WL 2145336, at *4-5 (D.S.D. Feb. 2, 2019), *R & R adopted,* 2019 WL 1857120 (D.S.D. Apr. 23, 2019) (finding that while one statement was suppressible, the vast majority were volunteered, involved public safety, or were in response to follow up clarification).

[36] *See United States v. Becerra*, 958 F.3d 725, 729-30 (8th Cir. 2020) (finding that an officer "expanded the scope of the exchange beyond the subject of [defendant's] original statement with a question that was likely to elicit an incriminating response").

[37] *See* Mot. Hr'g Ex. 14 at 05:20-05:23.

[38] *See* Mot. Hr'g Ex. 14 at 09:20-09:24.

likely to foster an incriminating response from Walking Eagle.[39] Consequently, the three requests, and any responses Walking Eagle gave to them, are subject to suppression and may not be used in the government's case-in-chief at trial.[40]

**3. On the Porch – Uncuffed**

In the final stretch of time before the confrontation ended, whether the removal of Walking Eagle's handcuffs dispelled his prior custodial status or not, no further communication took place that amounted to interrogation.[41] Officers had a brief and limited dialogue with Walking Eagle. Their primary spokesperson, Kettell: (1) advised he was going to remove the cuffs; (2) informed Walking Eagle he was not under arrest; (3) said he wanted to visit when Walking Eagle was sober; and (4) informed Walking Eagle they brought him outside just to talk.[42] After officers took the cuffs off Walking Eagle, they stepped away and left him to his own devices. The timeframe in which Walking Eagle was uncuffed presents no *Miranda* issue.

---

[39] *See Jackson*, 852 F.3d at 771-74 (finding that officers crossed the line from permissible inquiry into interrogation when they should reasonably have known the information sought was directly relevant to substantive offense).

[40] *Miranda*, 384 U.S. at 444.

[41] *See* Mot. Hr'g Ex. 15 at 00:00-05:13.

[42] *See* Mot. Hr'g Ex. 15 at 00:23-00:30, 00:57-01:03.

**4. Impeachment**

Although Kettell's three requests for information went beyond what is permitted under *Miranda*, the requests, and Walking Eagle's responses to them, may still be used at trial. "Statements taken without *Miranda* warnings (though not actually compelled) can be used to impeach a defendant's testimony at trial … though the fruits of actually compelled testimony cannot."[43]

A court must look at the totality of the circumstances and consider, among other things, the conduct of the officers and the characteristics of the accused, to determine whether a statement was voluntary or compelled.[44] "A statement is voluntary if it is 'the product of an essentially free and unconstrained choice by its maker.'"[45] If, however, statements are "extracted by threats, violence or express or implied promises sufficient to overbear [the defendant's] will and [to] critically impair his capacity for self-

---

[43] *United States v. Patane*, 542 U.S. 630, 639 (2004).

[44] *See United States v. Daniels*, 775 F.3d 1001, 1004-05 (8th Cir. 2014) ("We consider, among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition.").

[45] *United States v. Anaya*, 715 F.Supp.2d 916, 931 (D.S.D. 2010) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973)).

determination," then they are considered involuntary.[46] The government bears the burden of proving voluntariness by a preponderance of the evidence.[47]

Walking Eagle's statements were the product of his own free will. Although he had been drinking earlier (which the PBT results confirmed), Walking Eagle maintained he was not intoxicated.[48] And as someone familiar with the criminal justice system,[49] he was cooperative[50] and made his statements in plain view of a clan, milling about, at the scene.[51] The recordings contain no trace of threats, coercion, misleading promises, or other impropriety on the part of officers during the relatively short lived encounter.[52] Walking Eagle's statements were voluntary and are thus admissible as impeachment evidence should he choose to take the witness stand and testify.

---

[46] *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004).

[47] *Id.*

[48] *See* Mot. Hr'g Ex. 16 at 01:30 (Walking Eagle: "I'm not intoxicated").

[49] *See United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) ("A history of interaction with the criminal justice system supports an inference that an interviewee is familiar with his constitutional rights and that his statements to the police are voluntary."); Docket No. 15 at 4-7.

[50] *See* Mot. Hr'g Tr. 39 ("Q. Was he generally cooperative with you? A. Yes, he was.").

[51] *See* Mot. Hr'g Exs. 14-16.

[52] *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'"); Mot. Hr'g Exs. 13-16.

**B. Fruit of the Poisonous Tree**

Walking Eagle's second, and last, claim is that because "the search of his person was without a warrant and therefore unlawful," all evidence obtained during the incident must be suppressed as "fruit of the poisonous tree."[53] The only potential search the Court observed from the recorded footage was a glimpse in the home of what appears to be a permissible *Terry* frisk.[54] Officers had the consent of the homeowner (Tanya) to enter and search the house.[55] And they had reason to believe Walking Eagle was involved in a homicide that had just occurred.[56] Any search of the residence and Walking Eagle and any seizure of evidence from them, via camera recordings or otherwise, were consonant with the Fourth Amendment and did not cultivate a virulent tree from which tainted fruit could develop.

---

[53] Docket No. 24 at 9-10.

[54] *See Terry v. Ohio*, 392 U.S. 1, 30-31 (1968).

[55] Mot. Hr'g Ex. 13 at 07:50; Mot. Hr'g Tr. 9 ("Q. Did you eventually get consent from the homeowner to search that residence? A. Yes, we did.").

[56] *United States v. Lawes*, 292 F.3d 123, 127 (2d Cir. 2002) (finding reasonable suspicion when subject matched the description of murder suspect); *Adkins v. Commonwealth*, 96 S.W.3d 779, 787 (Ky. 2003) ("When an officer believes he is confronting a murder suspect, he has presumptive reason to believe that he is dealing with an armed and dangerous person."); *see generally* 4 Wayne R. LaFave, *Search and Seizure*, § 9.6(a) at 872-73 (6th ed. 2020) (noting that courts generally view the right to frisk as being "automatic" when a suspect is stopped upon suspicion of having committed a homicide).

## CONCLUSION

Officers entered Tanya's home with her consent. Whatever search for and seizure of evidence that took place inside was reasonable and in accord with Fourth Amendment strictures. And while his conversations with Walking Eagle (in and outside the residence) were by and large acceptable, Kettell's three inquiries into what Walking Eagle knew about Lloyd's shooting death and the black SUV were improper. But because Walking Eagle's responses to the inquiries -- though obtained in violation of *Miranda* -- were voluntary, they are admissible to impeach any contrary trial testimony he may give.

## RECOMMENDATION

In accordance with the authorities and legal analysis set forth in this report, and the record now before the Court, it is

RECOMMENDED that Walking Eagle's Motion to Suppress[57] be granted in part. To the extent the Motion seeks to exclude, as substantive evidence (but not for impeachment purposes), Walking Eagle's responses to (1) "So I need to know what you know. You understand?" (2) "Yeah, but we need to know what happened out here with the black SUV," and (3) "I just, I just need you to tell us the truth though, that's what we

---

[57] *See* Docket No. 48; *see also* Docket No. 47 (setting the jury trial for January 25, 2022).

got to get down to," the Motion should be granted. In all other respects, the Motion should be denied.

## NOTICE

The parties consented to a reduced time of five days to file their objections to this report and recommendation, given the proximity of the trial.[58] Unless an extension of time for cause is later obtained,[59] failure to file timely objections will result in the waiver of the right to appeal questions of fact.[60] Objections must "identify[] those issues on which further review is desired[.]"[61]

Dated this 12th day of January, 2022, at Pierre, South Dakota.

BY THE COURT:

MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE

---

[58] Mot. Hr'g Tr. 60.

[59] *See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

[60] *See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[61] *Arn*, 474 U.S. at 155.